RAWLS, Judge.
A broadside challenge to the constitutional application of the City’s Housing Code is sought by appellants Stallings, et al. However, as the trial court so aptly found in its final judgments dismissing appellants’ complaints with prejudice, three issues were presented and considered, viz:
“(1) Whether the requirement by the Jacksonville Housing Code, page 506, section 304.13, requiring the installation of screen doors is capricious and arbitrary and a violation of their police powers.
“(2) Whether the Jacksonville Housing Code, page 906, section 306.5 that requires owners of multi-unit dwellings to provide and be responsible for the extermination of insects, rodents, or other pests within the building or premises, is prejudicial or a violation of the police powers.
“(3) Whether the citations and inspection forms used by the Jacksonville Housing Authority are too vague to notify the owners of the specific alleged defects and, therefore, are a violation of due process of law.”
We first consider the screen door question. Appellants Stallings and Butts own a 50-unit apartment building which, when constructed in 1967, complied with all requirements of the Florida Hotel and Restaurant Commission and the 1967 Jacksonville Housing Code. The apartment complex is located in, what was termed by one witness, a high crime area, and steel doors were installed in all exterior openings, primarily, for the security of the tenants and for minimal maintenance. In 1972, the City adopted Ordinance 72-307-158 amending the City’s Housing Code. Section 906-304.13 provides:
“906-304.13 — Screens. Every door opening directly from a dwelling unit to outdoor space shall have screens and a self-closing device; and every window or other device opening to outdoor space, used or intended to be used for ventilation, shall likewise have screens. (USDs 2-5 Excepted)
“Dwelling buildings containing central heating furnaces and air-conditioning equipment for mechanically ventilating the building year around are not required to have screen or door or window openings. Window type air-conditioning units are not included in this exception. (USDs 2-5 Excepted)”
The apartment building owned by appellants Stallings and Butts did comply with the requirement that windows be screened to provide for adequate ventilation; however, screen doors were not installed as required by amended Section 304.13. The City, in carrying out the announced purpose of the subject ordinance “establishing minimum standards . . . essential to make dwellings, dwelling units . safe, sanitary and fit for human habitation”, directed the property owners to install screen doors. Appellants strenuously objected on the grounds that such did not fall within the police power and would constitute a deprivation of property, without due process of law, by requiring a large expenditure of funds for a purpose not within the purview of public health and safety. In support of its health theory, the City adduced two outstanding authorities: Mr. Eric W. Mood, Associate Clinical Professor of Public Health, Department of Epidemiology and Public Health, Loyola University, and Dr. Lawrence E. Hinkle, Jr. (Director of the Divi *72 sion of Epidemiology), Professor of Medicine at Cornell University Medical College.
Professor Mood, after explaining the many diseases that may be borne by insects, testified:
“ . Screen doors are considered necessary for the health and sanitation of occupants residing in temperate, semi tropical and tropical areas, except for those dwelling units that are so far above the ground ... if the authorities believe they are sufficient to be above the flight capabilities of those insects which the authorities think are capable of carrying diseases.
“The health factors that come into play are those in which a screen acts as a barrier against the insect vector of disease, from a disease standpoint . . .”
Dr. Hinkle likewise testified:
“In my opinion, a requirement for screen doors in a community such as Jacksonville is essential to the health of the community as a whole, as well as to the health of those who may occupy dwelling units.”[1]
Unquestionably, the testimony of the eminent epidemiologists supports a finding that the section of the Housing Code requiring screen doors is constitutionally valid insofar as it protects the health of the citizens of Jacksonville. However, the subject section, by exempting “[d] welling buildings containing central heating furnaces and air-conditioning” from the requirements imposed on non-aid-conditioned and non-centrally air-conditioned dwelling buildings, is flagrantly discriminatory.
Entrance doors to centrally air-conditioned dwellings must be opened and closed for ingress and egress the same as an entrance door to a non-centrally air-conditioned dwelling. Professor Mood was of the opinion that screen doors are necessary for the health and sanitation of occupants and that a screen door should be hung to swing outside, “ . . .so that when the door is opened and mosquitoes or flies that may be resting on the door are disturbed, they will fly out into the environment rather than into the interior . . . .” Mosquitoes and flies may rest upon a steel door opening into a centrally air-conditioned dwelling just as well as a steel door opening into a non-air-conditioned or non-centrally air-conditioned dwelling.
Further, we take judicial notice that children are children. Those privileged children chilled by central air-conditioning are just as subject to leaving a door open as those less fortunate children who must endure the semitropical climate of Jacksonville with window-type air-conditioning units or without the benefit of any *73 air-conditioning. Section 304.13 of the Jacksonville Housing Code is blatantly discriminatory and is being unconstitutionally applied.[2]
We next consider the propriety of the City imposing upon owners of multi-unit dwellings the responsibility for the extermination of insects, rodents or other pests within the building.[3] A man’s home is his castle. Unsanitary conditions constitute the banquet feast upon which insects and rodents thrive. To require the owners, by provisions of a penal ordinance, to invade the private dwelling of a tenant and be responsible for keeping the interior free of insects, etc., is clearly beyond the police power of the City. Such duty can be imposed constitutionally only upon the occupant.[4]
Finally, we consider the question of the sufficiency of the citations and inspection forms meeting minimal due process standards. In considering this question, the trial judge opined:
“As to the vagueness of the citation and inspection report, I must admit that I am troubled. Many items appear vague when not accompanied by ‘remarks’. However, there is testimony that neither the plaintiffs [appellants] nor their representative ever looked at the property with the report in hand to see if the alleged defects could be detected. Without anyone ever having looked to see if the alleged defects could be detected, [sic] Without anyone ever having looked to see if the alleged violations could be ascertained, I cannot say beyond a reasonable doubt that the allegations were vague to the extent of being unconstitutional.”
No person should be required at peril of life, liberty or property to speculate as to the meaning of a penal statute. The subject notice is couched in such vague and uncertain terms that an owner’s sole recourse to discover the alleged existing defects is to pursue the city inspector, either at city hall or wherever the owner may find such functionary, and inquire as to the transgressions of which the owner is accused. As yet, we have not in this jurisdiction reached the totalitarian era envisioned by Orwell’s 1984.[5] In this bicentennial year, we are well advised to revisit the principles announced in the two great historical writs.[6]
The judgments appealed are REVERSED.
BOYER, C. J., concurs.
SMITH, J., dissents.

. Dr. Hinkle further testified:
“ . . . But there is a reason why screen doors with adequate closures have been prescribed, and it has to do with the fact that, in a community like this, people do leave their doors open even though they have the windows open, and that is why we put the screen doors.
“Q. That may be true, but you have never seen a member of the Society Court [apartment building owned by appellants Stallings and Butts] leave their doors open?
“A. I am not here to testify about the Society Court Apartments. I am a resident of another city, and I know nothing about those things. I am testifying about the reason why we put screen doors on it.
“Q. If a unit lias adequate ventilation through the windows as per our Code and as per our Code requirements, there really is no necessity for opening a door except for the purpose of getting in or out; is that not true?
“A. . . . That when children are playing in and out of doors, this is even more likely to happen. So that, regardless of what you or I or others might think is necessary for them to do, they are prone to do it, and we do put the screen doors on for the reason of preventing access of insects at this time.”

. Griffin v. Sharpe, 65 So.2d 751 (Fla.1953); and Ellis v. Thiesen, 78 Fla. 47, 82 So. 607 (1919).

. Section 906.306.5 states : “Every occupant of a single dwelling building and every owner of a building containing two or more dwelling units shall be responsible for the extermination of any insects, rodents, or other pests within the building or premises.”

. Safer v. City of Jacksonville, 237 So.2d 8 (1 Fla.App.1970), wherein this court held that the keeping of occupied rental units in a clean and sanitary condition could not be imposed upon tlie owner.

. G. Orwell, 1984 (1949).

. Magna Cliarta or the Great Charter of King John, June 15, A.D. 1215; and the Declaration of Independence, July 4, 1776.